# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** |  |
| **Plaintiff,** |  |
|  | **CASE NO. 2:18-cr-060** |
| **vs.** |  |
|  | **CHIEF JUDGE EDMUND A. SARGUS** |
| **GERALD A. LAWSON,** |  |
| **Defendant.** |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through undersigned counsel, submits its Sentencing Memorandum in connection with Defendant Gerald A. Lawson's upcoming sentencing hearing. The Government respectfully requests that the Court adopt the factual findings and recommendations in the Presentence Investigation Report ("PSR") and sentence Lawson to five years' imprisonment, to be followed by a three-year term of supervised release.

## I.  BACKGROUND

### A.  Factual Background[1]

On February 10, 2018, Westerville Police Officers Eric Joering and Anthony Morelli responded to a domestic-disturbance call at 312 Crosswind Drive.  Upon arrival, the officers were met with gunfire from one of the residents, Quentin L. Smith.  Officer Joering (39), a seventeen-year police veteran, was pronounced dead at the scene.  Officer Morelli (54), a twenty-nine year police veteran, was taken to the hospital before dying from his gunshot wounds.

---

[1] The facts detailed in this Sentencing Memorandum were first set forth at Lawson's detention hearing on February 14, 2018, and then described again in detail in the PSR.

The weapon that Smith used to shoot and kill the officers was determined to be a Glock .40 caliber semi-automatic handgun.  Smith was prohibited from having that gun due to a prior felony conviction for burglary (with a firearm specification) and a prior misdemeanor conviction for domestic violence.  *See* 18 U.S.C. § 922(g)(1) & (g)(9).  Both convictions stemmed from the same incident in 2008.  During that incident, Smith, who had been fighting with his then-wife, barged into a neighbor's residence, found his wife hiding there, placed a loaded .40 caliber handgun to her head, and began screaming at her—making her fear for her life.  Smith was arrested and, as a result of his subsequent convictions, should never have had access to the firearm that he used to kill Officers Joering and Morelli.

Tragically, Smith had a lifelong friend in the defendant in this case, Gerald A. Lawson. Unlike Quentin Smith, Gerald Lawson's criminal record was clean, so he *could* purchase a firearm. Indeed, he did purchase a firearm on May 18, 2017—the same Glock .40 caliber handgun that his friend used in the Westerville Officers' shooting and deaths this past February.

As the PSR accurately reflects, Gerald Lawson and Quentin Smith were lifelong friends. Lawson has admitted as much to both law-enforcement officials and his friends, to whom he described Smith as being "like a brother" to him.  Lawson and Smith were in frequent contact during the fourteen months leading up to the officers' shooting.  They produced and traded music together, discussed attending parties for each other's loved ones, and, at times, loaned each other money.  At one point, just two months before Lawson purchased the firearm for his friend, the two men even discussed moving in with one another near Cleveland—going so far as to arrange apartment showings for Lawson and Smith's second wife.

But their close friendship had darker aspects to it too.

A series of text messages from December 2016—just five months before Lawson purchased the firearm—showed that both men were short on money as the holidays approached. The mother of one of Lawson's children was about to be evicted, and Lawson was having trouble paying his rent as well. Despite these problems, Lawson agreed to loan Smith $100. At that point, Smith and Lawson discussed the need to commit a robbery. Smith texted Lawson, "We gotta hit a lick," to which Lawson replied, "Yea," and immediately after, responded, "[a] Big lick." Then, on Christmas Day, after Lawson told Smith that he was down to just $11, Smith replied that he "got a play" and would "put a rack or two in your hand using yo bank account if you need some bread." Lawson replied, "Aight cmon with it."

Likewise, a string of text messages from May 2017—just a week before Lawson purchased the firearm—showed the pair arranging a drug deal. On May 8, Smith asked Lawson if he "go[t] a plug [source] on them cialis." Lawson replied, "Yea me. Just sold some Viagra's." Lawson then explained that he would have "Percs [Percocet] and vicodins too," and then clarified, "Like Thursday soon." On May 18—the same day that Lawson finalized his purchase of the firearm—Smith texted him, "Don't forget them pills." Lawson replied, "I got em." Then, a few days later, Lawson texted Smith and asked "How them pills treat u fool?" Smith replied, "Man I love em gave my nigga some he fux with them too."

In addition to Quentin Smith (1) discussing the need to commit a robbery; (2) offering to put some fast cash in Lawson's bank account from "a play" he had; and (3) buying drugs from him, Gerald Lawson had one very stark reason _not_ to sell his friend a deadly weapon: Lawson knew that Smith had a violent past, including a history of domestic violence, that prohibited him from purchasing or possessing a firearm.

As the PSR notes, Lawson admitted to working as a file clerk in the Cuyahoga County Prosecutor's Office—the same office that prosecuted Smith in 2008-2009. As a file clerk, he had access to Smith's private case file, which contained sensitive information like police reports, witness statements, and prosecutors' notes. The Prosecutor's Office provided an access query log that showed Lawson logged into Smith's case file on four occasions between 2011 and 2014. A representative from the Prosecutor's Office indicated that Lawson's access of Smith's file was "inappropriate," because he was checking into matters after Smith had served his time in prison— in other words, when there were no active case proceedings that would require an update to his file. When interviewed by law-enforcement officials, Lawson admitted to reading Smith's case file and to knowing details about his criminal history, including the crimes he had been convicted of and that fact that Smith had gone to prison for two years.

Despite knowing these facts about his friend, and despite knowing that someone in Smith's shoes was prohibited from having a firearm, Lawson chose to arm him with a deadly handgun anyway. In the process of purchasing the Glock handgun, Lawson certified to both Stonewall Gun and Range and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that he was the "actual transferee/buyer of the firearm"; that he understood federal law prohibited people who had been convicted of felonies or of domestic violence from receiving firearms; and that all of his answers on the ATF Firearms Transaction Record ("ATF Form 4473") were true and correct.[2] Lawson certified that he understood these warnings and that his answers were true and correct not once (when he first went to purchase the gun on May 14, 2017), but twice (when he returned four days later to receive it).

---

[2] The ATF Form 4473 was introduced as Government Exhibit 1 during the February 14 detention hearing. (Hr'g Tr., ECF No. 21, PageID ##134-35; ECF No. 6-1, PageID ##11-13).

Aside from buying the gun for Smith, Lawson stood by his friend in a very public way even *after* learning about the Westerville Police Officers' shooting and deaths.  In the early morning hours on Sunday, February 11, 2018 (the day after the shooting), Lawson logged onto Facebook and posted a series of photos of himself with Smith at various stages of their lives.[3]  Lawson also posted a tribute to his friend alongside the photos, stating as follows:

> First nigga to ever believe in me.  I said you looked like Quincy McCall off love and basketball and everybody ran with that name including you.  You know im gon stand 10 toes fa you.  Ima get up off this internet before the trash from fakers in the city start and I flip on one of my so called peers but I know 2018 ain't been good to me so far.  I'm tired of crying.  Love u boy.  We gon chop it.

After news reports began indicating that a friend of Smith's had purchased the firearm that he used to shoot and kill the officers, Lawson deleted his Facebook tribute.

### B.  Procedural Background

On May 31, 2018, Lawson pleaded guilty to one count of aiding and abetting a prohibited person in possession of a firearm.  *See* 18 U.S.C. § 922(g)(1) & (g)(9) and 18 U.S.C. § 2(a).

This August, the Probation Office released Lawson's PSR, which calculated a base offense level of 12.  PSR, ¶ 26.  The PSR then increased the offense level to 18 under a provision that applies when a defendant "transferred any firearm . . . with knowledge, intent, or reason to believe that it would be used in connection with another felony offense."  *Id.* at ¶¶ 27-30 (quoting U.S.S.G. § 2K2.1(b)(6)(B)).  After crediting Lawson for acceptance of responsibility, the PSR settled on a total offense level of 15.  *Id.* at ¶¶ 34-38.  Based on an offense level of 15 and a criminal history category of I, the PSR calculated an advisory sentencing range of 18 to 24 months before turning to the departure provisions from Chapter 5 of the Sentencing Guidelines.  *Id.* at ¶¶ 74, 88-90.

---

[3] The Government introduced a screenshot of Lawson's Facebook post as Government Exhibit 5 during the detention hearing.  (Hr'g Tr., ECF No. 21, PageID #148; ECF No. 6-1, PageID ##17-18).

The Probation Officer then applied a 10-level upward departure under U.S.S.G. § 5K2.1 (the "death results" provision) to reflect the loss of the officers' lives and the fact that this offense fell outside the heartland of straw-purchase cases. *Id.* at ¶¶ 88-90 & Sentencing Recommendation. Based on a revised offense level of 25, the PSR calculated a revised range of 57 to 71 months' imprisonment. *Id.* at Sentencing Recommendation. The PSR then recommended sentencing Lawson near the low end of that revised range—to a term of imprisonment of sixty months (five years), to be followed by a three-year term of supervised release. *Id.*

The Government did not file any objections to the PSR. Lawson filed several objections, most of which relate to application of the offense enhancement under § 2K2.1(b)(6)(B), the departure under § 5K2.1, or the factual underpinnings for both adjustments.

## II. LEGAL STANDARDS

After *Booker v. United States*, 543 U.S. 220 (2005), district courts must engage in a three-step sentencing procedure. Courts must first determine the applicable Guidelines range, then consider whether a departure from that range is appropriate, and finally, consider the applicable Guidelines range—along with all of the factors listed in 18 U.S.C. § 3553(a)—to determine what sentence to impose. The central command to district courts in imposing a sentence is to fashion one that is sufficient, but not greater than necessary, to meet the goals set forth in § 3553(a).

## III. ANALYSIS

### A. The Applicable Guidelines Range

The Court must first calculate the applicable Guidelines range. The Probation Officer calculated Lawson's Guidelines range (before any departures) to be 18 to 24 months based on a total adjusted offense level of 15 and a criminal history category of I. PSR, ¶ 74. The Court should adopt those Guidelines calculations at the time of sentencing.

The PSR first determined that Lawson's base offense level is 12, and his criminal history category is I. PSR, ¶¶ 26, 42. There are no objections to either calculation. The Probation Officer then increased the offense level to 18 under an enhancement that applies when the defendant "transferred any firearm . . . with knowledge, intent, or reason to believe that it would be used in connection with another felony offense." PSR, ¶¶ 27-30 (quoting U.S.S.G. § 2K2.1(b)(6)(B)) (the "transfer enhancement").[4] Lawson has objected to application of the transfer enhancement. *See* PSR Objection #7. He argues that he was not personally involved in another felony offense and that he never would have bought the gun for Quentin Smith if he had thought Smith would use it to shoot and kill two police officers. *Id.*

Lawson's objection misses the mark twice over. The transfer enhancement applies regardless of whether he was personally involved in another felony offense and regardless of whether he had knowledge or reason to believe that the firearm he gave to Smith would be used in a *specific* felony offense—i.e., the officers' murders. Instead, the transfer enhancement applies whenever a defendant has knowledge, intent, or reason to believe that the firearm will be used in connection with *any* other felony offense.

1. The Transfer Enhancement Applies Regardless of Whether the Defendant Was Personally Involved in "Another Felony Offense."

Lawson first argues that the transfer enhancement should not apply because he did not use or possess the firearm he purchased in connection with another felony offense. In other words, he contends that the enhancement should not apply because he was not personally involved in another felony offense beyond transferring the firearm to Quentin Smith.

---

[4] U.S.S.G. § 2K2.1(b)(6)(B) (the "transfer enhancement") used to appear at § 2K2.1(b)**(5)** until the Guideline was renumbered in 2006. *See United States v. Harris*, 552 F. App'x 432, 438 n.1 (6th Cir. 2014).

This argument is a non-starter; it overlooks that the enhancement contains two clauses, which "speak to different scenarios." *See United States v. Lang*, 537 F.3d 718, 721 (7th Cir. 2008). The enhancement, reprinted in full below, states that the offense level should be increased:

> If the defendant—used or possessed any firearm or ammunition in connection with another felony offense; *or* possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used in connection with another felony offense.[5]

U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). The first clause applies when the *defendant* used or possessed the firearm in connection with another offense. *Id.* But the second clause, in which the verb "transferred" is employed, "contemplates felonies committed by third parties." *Id.*

Because these clauses speak to two different scenarios, "[t]he guideline does not require the independent felony to be committed by the defendant." *United States v. Harvey*, 653 F.3d 388, 389 (6th Cir. 2011). Instead, "the enhancement applies on its face if [the defendant] had reason to believe that the firearm would be used 'in connection with' another felony offense, *regardless of who committed that felony*." *Id.* (emphasis added). The fact that Lawson did not personally participate in the commission of another felony offense, or had no personal involvement beyond the initial transfer of the firearm, is irrelevant. *Id.*

2. The Transfer Enhancement Applies Regardless of Whether the Defendant Had Knowledge, Intent, or Reason to Believe the Firearm Would Facilitate a *Specific* Felony Offense.

Lawson next argues that the transfer enhancement should not apply because he did not know or believe that Quentin Smith would use the firearm to shoot and kill two police officers. In short, he contends that the enhancement only applies when a defendant transfers a firearm with knowledge, intent, or reason to believe that it will facilitate a *specific* felony offense.

---

[5] The term "[a]nother felony offense," for purposes of this enhancement, "means any Federal, state, or local offense, other than the . . . firearms possession or trafficking offense, punishably by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1 cmt. n. 14(C).

Lawson is wrong again. In *United States v. Cummings*, the Sixth Circuit first confronted but rejected Lawson's argument. 19 F.3d 1434, 1994 WL 91825, at *2 (6th Cir. Mar. 22, 1994) (unpublished). There, the defendant argued that the enhancement "can only rest upon 'felony-specific' facts, which show the defendant had reason to believe a particular felony might be committed with the transferred firearm." *Id.* The court disagreed. *Id.* Instead, the court held that in light of the text and purpose of the enhancement (public safety), applying it "is appropriate when the defendant had reason to believe the transferred firearm would be used in connection with *any* felony, *without regard to whether the defendant had reason to know which particular felony might be committed*." *Id.* (emphasis added) (affirming application of transfer enhancement).

In *United States v. Cobb*, the Sixth Circuit cited *Cummings* favorably and extended its holding to the analogous cross-reference provision from the same Guideline. 250 F.3d 346, 349 (6th Cir. 2001) (addressing U.S.S.G. § 2K1.1(c)). In *Cobb*, the defendant provided her boyfriend with a pistol that he later used to shoot and kill a deputy sheriff. *Id.* at 348. She argued that the cross-reference should not apply "because she did not have 'knowledge or intent' that Deputy Bishop would be killed" with the firearm. *Id.* at 349. The Sixth Circuit rejected her argument after focusing on the text of the enhancement, which refers to "some other offense generally rather than on [a defendant's] state of mind *with respect to some specific offense*." *Id.* (emphasis added).

Other circuits have also rejected Lawson's argument. *E.g.*, *United States v. Stebbins*, 523 F. App'x 1, 5 (1st Cir. 2013) ("We have said before that a court need not find specific knowledge of any specific felonious plans for the provision to apply . . . ." (quotation omitted)); *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir. 1994) (holding that the transfer enhancement "does not require a defendant's knowledge of a specific offense to be committed").

These cases all foreclose Lawson's argument.

### 3.  The Transfer Enhancement Applies Because Lawson Had Reason to Believe that Smith Would Use the Firearm in Connection with Another Felony Offense Generally.

Here, the transfer enhancement applies because, as the PSR recounts, Lawson had reason to believe that Smith would use the firearm in connection with any number of felony offenses, including domestic violence, robbery, and drug possession, to name a few.  PSR, ¶ 30.

Courts may infer a certain level of knowledge about the recipient's intended use of a firearm based on the relationship between the seller and the buyer.  As one court explained, "[w]hen the seller has personal contact with the buyer, it is logical for the sentencing courts to infer a certain level of knowledge about their buyers' intended uses."  *United States v. Drake*, 310 F. App'x 592, 593 (4th Cir. 2009) (quotation omitted); *see also Stebbins*, 523 F.  App'x at 5 ("We have said before . . . that the enquiry into a defendant's belief may rest on plausible inferences from circumstantial evidence." (quotation omitted)); *United States v. Garcia*, 635 F.3d 472, 478 (10th Cir. 2011) (same).

Three cases in particular show why the transfer enhancement properly applies to Lawson. In *United States v. Dupree*, the Third Circuit affirmed application of the enhancement on very similar facts.  388 F. App'x 164, 167-68 (3d Cir. 2010).  There, the defendant was convicted of being a straw purchaser of a single firearm.  *Id.* at 164.  The defendant gave the gun to his cousin who, one month later, shot and wounded two police officers.  *Id.* at 165-66.  At sentencing, the district court applied the transfer enhancement.  *Id.* at 166-67.  The court of appeals affirmed because the defendant: (1) knew his cousin personally; (2) knew his cousin had a criminal record and had been involved with illegal narcotics; and (3) knew his cousin was not allowed to possess a firearm.  *Id.* at 168.  From these facts, the court reasoned, "Dupree had reason to believe that if he fulfilled Boyd's explicit request and purchased a firearm, Boyd would employ that firearm in furtherance of criminal activity which Dupree had been intimately familiar."  *Id.*

In *United States v. Mahalick*, the Seventh Circuit affirmed application of the same enhancement.  498 F.3d 475, 480-81 (7th Cir. 2007).  There, the defendant transferred a firearm to his former cell-mate for $200.  *Id.* at 478.  That cell-mate later used the gun in a shootout.  *Id.* The district court found the defendant had reason to believe the firearm would facilitate another felony offense because the recipient was a gang member with a criminal history, and because the defendant knew the recipient had used drugs in the past.  *Id.* at 480-81.  The court of appeals affirmed on the same grounds, finding no clear errors in the district court's inferences.  *Id.*

Finally, in *United States v. Harvey*, the Sixth Circuit affirmed application of the transfer enhancement for a straw purchaser who sold guns to two individuals who, according to his own admissions, "were like brothers to him."  653 F.3d 388, 399 (6th Cir. 2011).  Because the purchaser knew the recipients so well and, in that case, knew that they had engaged in criminal behavior in the past (drug trafficking), the district court applied the enhancement.  *Id.* at 398.  The Sixth Circuit affirmed, finding that the district court drew a fair inference that because the recipients of the guns were like brothers to the purchaser, he had reason to believe that they may use the guns in connection with another felony offense.  *Id.* at 399.  In reaching that conclusion, the Sixth Circuit explicitly endorsed and relied upon the *Dupree* and *Mahalick* cases discussed above.  *Id.*

This Court should follow the same approach based on the close relationship between Lawson and Smith and, in particular, based on Lawson's intimate knowledge of Smith's criminal history.  Lawson has admitted to being lifelong friends with Smith and to giving him a nickname that has stuck to this day.  Lawson, like the defendant in *Harvey*, has referred to Smith as being "like a brother" to him.  Lawson and Smith were in frequent contact during the months leading up to the firearm transfer, including contemplating moving in with one another just two months beforehand.  Lawson and Smith also made music together and loaned each other money.

11

Lawson, moreover, knew that Smith was a convicted felon—someone who abused his first wife and had served time in prison for it. As a result, Lawson knew that Smith was prohibited by law from purchasing or possessing a firearm. Lawson had discussed a potential robbery with Smith just five months before buying the gun for him. Lawson had even arranged and completed an illegal drug transaction with Smith contemporaneously with the firearm sale and transfer.

Frankly, it is difficult to imagine anyone who was *better* situated than Lawson to know, or, at a minimum, to have reason to believe, that Quentin Smith might use the firearm in connection with some other felony offense. Like the defendants in *Dupree*, *Mahalick*, and *Harvey*, Lawson shared a close, personal relationship with the recipient of the gun. Like those defendants, Lawson also knew that the recipient was a convicted felon who could not lawfully purchase or possess a firearm. Like those defendants, Lawson knew that the recipient of the gun was involved in illicit drug use and distribution. Therefore, like the defendants in *Dupree*, *Mahalick*, and *Harvey*, Lawson had reason to believe that the firearm he transferred would be used in connection with another felony offense—triggering the enhancement from § 2K2.1(b)(6)(B).

Unlike other defendants, however, Lawson had an *additional* reason to be on alert, and to refuse to arm his friend with a deadly weapon. Lawson knew that Quentin Smith had a history of domestic violence—including domestic violence involving a firearm. As the Supreme Court has recognized, "domestic abusers exhibit high rates of recidivism, and their violence often escalates in severity over time." *United States v. Bryant*, 136 S. Ct. 1954, 1959 (2016) (quotation omitted); *see also United States v. Chovan*, 735 F.3d 1127, 1140 (9th Cir. 2013) ("[W]e agree with the government that 'a high rate of domestic violence recidivism exists. . . . [and that] domestic abusers use guns.'" (collecting cases and statistics)).

The Sixth Circuit has also recognized the high rate of recidivism among domestic abusers and has warned of the accompanying threat to public safety that firearms pose when placed in their hands.  In *Stimmel v. Sessions*, the court noted that a 40% recidivism rate "likely underestimates the extent of continued abusive behavior" and warned that "[n]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners." 879 F.3d 198, 209 (6th Cir. 2018).  The court also warned that, as far as domestic violence goes, "the victim is more likely to be killed when a gun is present."  *Id.*  In *Stimmel*, the court even forecasted the grim circumstances that led to the deaths of Officers Joering and Morelli:  "*This risk of death extends beyond those in an intimate or familial relationship with the abuser.  As the Law Center notes, responding to family violence calls is among a police officer's most risky duties.*" *Id.* at 210 (emphasis added) (citation omitted) (noting police fatality statistics).

Is it any wonder that Lawson had reason to believe his longtime friend might use a firearm in connection with another felony offense?  Or that, as a domestic abuser, Smith might recidivate— leading to the 9-1-1 call that preceded the officers' deaths?   This all seems sadly predictable. That's why Lawson should never have sold Smith the gun, and why, on these facts, the Court should apply the transfer enhancement from § 2K2.1(b)(6)(B).

## B.  Possible Departures from the Applicable Guidelines Range

The Court must next consider possible departures from the applicable Guidelines range. The Probation Officer determined that a departure is warranted under § 5K2.1.  PSR, ¶¶ 88-90. Under this provision, the Probation Officer recommended increasing Lawson's offense level from 15 to 25, for a revised Guidelines range of 57 to 71 months.  *Id.* at Sentencing Recommendation. The Court should adopt this recommendation at the time of sentencing, Lawson's threadbare objection notwithstanding.  *See* PSR Objection #9.

13

Section 5K2.1 authorizes a sentence above the applicable Guidelines range "[i]f death resulted." U.S.S.G. § 5K2.1. Under this provision, the Court must engage in a two-step process. First, the Court must determine whether a departure is warranted. If so, the Court must then determine just how far to depart. *United States v. Bayles*, 986 F.2d 1415, 1993 WL 46892, at *3 (4th Cir. Feb. 12, 1993) (unpublished). As one court explained, "[u]nder the guidelines, the triggering event is 'if death resulted.' . . . In other words, a death resulting from a defendant's crime opens the door; 'the extent to which death or serious injury was intended or knowingly risked' is a factor going to how far the door is opened." *Id.*

### 1.  A Departure Is Warranted Because Two Deaths Resulted from Lawson's Conduct.

Two cases—one involving the "death results" Guideline and another a similar Guideline for "significant physical injury"—show why a departure is warranted. In *United States v. Nguyen*, the district court departed under § 5K2.1 in a straw-purchase case where the recipient of two firearms shot and killed two firefighters who were responding to a blaze he set after the defendant provided him with the firearms. *See* 622 F. App'x 89, 90 (2d Cir. 2015). The straw-purchaser faced an initial Guidelines range of 18 to 24 months. *United States v. Nguyen*, No. 13-CR-6044L, 2017 WL 1397142, at *1 (W.D.N.Y. Apr. 19, 2017). The district court sentenced her *to eight years instead*—departing upward because "[d]eath and significant physical injury unquestionably resulted from [her] crimes." *Nguyen*, 622 F. App'x at 90. That sentence was affirmed on appeal because the defendant acted "recklessly" in providing firearms to the shooter (her neighbor), whom she knew to be a violent and mentally unstable felon, and because "the Sentencing Guidelines did not sufficiently account for the severity of [her] conduct and culpability." *Id.* at 90-91 (affirming departure due to "the multiple deaths and injuries that resulted"—which took defendant's conduct "well outside the heartland of straw man purchase cases").

14

Similarly, in *United States v. Kitchen*, the district court departed upward under § 5K2.2 ("significant physical injury") in a straw-purchase case where the firearm was later used by an unknown and subsequent transferee to shoot and injure an innocent motorist.  87 F. App'x 244, 245 (3d Cir. 2004).  In *Kitchen*, the defendant bought and illegally resold a 9mm pistol, which was later resold to an unknown third party.  *Id.*  The recipient then used the firearm to shoot and severely wound a motorist in a fit of road rage.  *Id.*  The district court departed under § 5K2.2 and sentenced the defendant to 57 months.  *Id.*  The Third Circuit affirmed, finding that the defendant was "sufficiently culpable to warrant [a] departure," even though he neither knew the shooter nor sold the firearm to him, and even though the shooting occurred over thirteen months after the defendant sold the gun to the original buyer.  *Id.* at 247.  The court noted those mitigating factors but affirmed the departure anyway, explaining that, "[b]y engaging in the offense of conviction, [the defendant] knowingly created and deliberately disregarded the risk that one or more firearms would be used to criminally injure another person."  *Id.*  In short, because the straw purchaser "recklessly initiated 'the chain of circumstances that resulted in injury to [the motorist]," a departure was warranted. *Id.*  As in *Nguyen*, the court based its holding, in part, on the fact that the "*actual* injury inflicted" took the case "out of the 'heartland' of § 2K2.1."  *Id.* at 246-47.

So too, here.  Lawson acted recklessly in providing his friend, whom he knew to be a violent felon, with a deadly weapon.  In so doing, he helped put into motion a chain of events that risked both death and serious bodily injury.  Two police officers are dead as a result of that reckless chain of events, and the substantive firearm Guideline, § 2K2.1, does not take into account the officers' tragic loss of life.  This case falls well outside the "heartland" of straw-purchase cases and merits a sentence well above the otherwise applicable range of 18 to 24 months.

Although Lawson has argued that his sentence should be limited because he did not *intend* for the officers to be killed, "there was (and still is) no binding Sixth Circuit or Supreme Court precedent requiring a district court to make an 'intended' or 'knowingly risked' factual finding [to depart under § 5K2.1] . . . ." *United States v. Robinson*, 732 F. App'x 405, 409 (6th Cir. 2018); *see also Bayles*, 1993 WL 46892, at *3 ("Bayles argues that the court was required to find that she 'intended or knowingly risked death' before departing.  We disagree that such a finding is necessary.").  Rather, the Court may depart when, as here, a defendant "put into motion a chain of events that risks serious injury or death, *even when an intent to harm is entirely absent and the defendant was not directly responsible for the death*." *United States v. Scheetz*, 293 F.3d 175, 191 (4th Cir. 2002) (emphasis added); *United States v. Diaz*, 285 F.3d 92, 101 (1st Cir. 2002) (same).

## 2.  A 10-Level Offense Increase Is an Appropriate Extent of Departure.

Under the totality of the circumstances, a 10-level offense increase, resulting in a five-year sentence (as recommended by the Probation Officer) is appropriate under the factors the Court must consider.  *See* U.S.S.G. § 5K2.1.  Such a sentence accurately reflects the dangerousness of Lawson's conduct, which amounted to "a callous and extreme risk to public safety."  *See United States v. Daniells*, No. 15-10150-GAO, 2017 WL 2256988, at *4 (D. Mass. May 23, 2017).  Such a sentence also accurately reflects the extent to which Lawson knowingly risked death or serious injury by selling a deadly, semi-automatic handgun to someone whom he knew to be a dangerous felon.  *See Nguyen*, 622 F. App'x at 90.  Finally, such a sentence accurately reflects the fact that the offense level for the offense of conviction, as determined under § 2K2.1, accounts only for the *potential* loss of life, not the *actual* loss of *two* lives.  *See id.* at 90-91.  Because this case falls "well outside the heartland" of straw-purchase cases, a five-year sentence is warranted.  *Id.* at 91 (affirming eight-year sentence on similar facts).

16

## C.  Consideration of the Sentencing Factors from 18 U.S.C. § 3553(a)

Finally, the Court must consider the applicable Guidelines range alongside the sentencing factors outlined in 18 U.S.C. § 3553(a) to fashion a sentence that is sufficient, but not greater than necessary, to meet Congress's sentencing goals.

### 1.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense are gravely serious.  Lawson lied to a federally licensed firearms dealer and then sold a deadly weapon to a dangerous felon—callously and selfishly disregarding the public safety in the process.  Even if this story ended with the mere straw purchase of a firearm, it would constitute a serious crime, justifying a sentence at the high end of the Guidelines.  *See United States v. Elsaddique*, 252 F. App'x 992, 993 (11th Cir. 2007); *United States v. Arzu*, No. 5:07-CR-166, 2007 WL 2713908, at *3 (N.D. Ohio Sept. 17, 2007).  But the story does not end with that straw purchase.  Instead, the story continues through February 10, 2018, when two police officers who were responding to a call for help were shot and killed with that illegally purchased firearm.  And the story culminates the following day, when, instead of expressing any remorse for his actions, Lawson took to Facebook and posted a public tribute to the killer.  Given these considerations, and Congress's authorization of a ten-year sentence for this offense, the Court should not hesitate to impose a five-year sentence.

### 2.  The History and Characteristics of the Defendant

Lawson's history and characteristics speak for themselves.  He grew up in a stable and well-supported family.  He completed high school and took some college coursework.  He had every opportunity to succeed in life.  Yet instead of using those advantages for the public good, he put them to use for other purposes, including selling drugs into the community and providing a deadly weapon to a known and dangerous felon.

The same characteristics that might otherwise serve as mitigating factors enabled Lawson to commit the very crime for which he was convicted; without a clean record, he could not have purchased the firearm in the first place. As such, this factor should not weigh heavily in the Court's sentencing analysis.

### 3. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment, as Well as the Need to Afford Adequate Deterrence

The Court must also consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). The Government submits that a five-year sentence, to be followed by a three-year term of supervised release, will best serve these purposes.

Gun violence and illegal gun transfers represent a serious problem for society, and for this community in particular. In 2017, Columbus claimed 143 homicides, with an overwhelming number of victims being shot to death (83%). Sheridan Hendrix, *Columbus Homicides Hit Record-High in 2017*, The Lantern, *available at* https://www.thelantern.com/2018/01/columbus-homicides-hit-record-high-in-2017/ (Jan. 10, 2018). Straw purchasers flood the streets with illegal firearms—so much so that the Supreme Court has stated "no part" of Congress's "comprehensive scheme . . . to keep guns out of the hands of criminals" would work "if the statute turned a blind eye to straw purchases." *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014). Any sentence imposed must reflect the seriousness of this offense and must promote respect for the law, including Congress's "principal[]" goal in enacting the Gun Control Act of 1968 in the wake of Robert Kennedy's assassination—namely, "prevent[ing] guns from falling into the wrong hands." *Id.* at 2263. A five-year sentence will accomplish both objectives.

The goals of retribution and deterrence are important considerations in any sentencing, but they carry extra weight here. As other courts have recognized, "a substantial prison term" is necessary "to satisfy the need for general deterrence" and to "deter [other] straw purchasers who put guns onto the streets." *United States v. Collins*, No. 09-Cr-155, 2010 WL 183376, at *9-10 (E.D. Wis. Jan. 11, 2010) (imposing above-Guideline sentence); *see also United States v. Politano*, 522 F.3d 69, 73-74 (1st Cir. 2008) (affirming above-Guideline sentence in illegal gun sale case based on need for general deterrence). Indeed, "the class of straw purchasers—by definition adults without records—may be more amenable to deterrence than other classes of defendants." *Collins*, 2010 WL 183376, at *10. This case has garnered tremendous local and national media attention. It therefore provides an ideal opportunity to send a clear message to the *next* Gerald Lawson (i.e., the next person considering being a straw purchaser) that severe consequences will flow from their actions, however "innocent" they may seem at the time.

### 4. The Need to Protect the Public

The Court must also consider the need for the sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Although it's not clear if Lawson poses a continuing threat to the public, other courts have cited this factor in straw-purchase cases to justify above-Guidelines sentences. *United States v. Madsen*, 809 F.3d 712, 720 (1st Cir. 2016).

### 5. The Kinds of Sentences Available and the Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant

The Court must also consider "the kinds of sentences available" and "the sentencing range established for the applicable category of offense committed by the applicable category of defendant." 18 U.S.C. § 3553(a)(3)-(4). Based on a total offense level of 25 (or 15) and a criminal history category of I, the Guideline range falls within Zone D of the sentencing table. As a result, "the minimum term shall be satisfied by a sentence of imprisonment." U.S.S.G. § 5C1.1(f).

<u>6.  The Need to Avoid Unwarranted Sentencing Disparities</u>

Finally, the Court must consider the need to avoid unwarranted sentencing disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(6).  A five-year (60-month) sentence will best avoid unwarranted sentencing disparities for similar straw purchasers.  *Compare Nguyen*, 622 F. App'x at 91 (96-month sentence where transferred firearms led to death of two firefighters), *with Kitchen*, 87 F. App'x at 245 (57-month sentence where transferred firearm led to severe injury of motorist), *and Madsen*, 809 F.3d at 719-21 (36-month sentence where transferred firearms led to no injuries or deaths).

## IV.  CONCLUSION

For these reasons, the Government respectfully requests that Lawson be sentenced to a five-year term of imprisonment, to be followed by a three-year term of supervised release.

Surviving family members of Officers Joering and Morelli have asked to submit letters to the Court for its consideration in sentencing.  Those letters are attached to this filing in accordance with 18 U.S.C. § 3661.  *See, e.g.*, *United States v. Weiner*, 518 F. App'x 358, 367 (6th Cir. 2013); *United States v. Case*, 434 F. App'x 522, 523 (6th Cir. 2011).


Respectfully Submitted,


BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY


s/Noah R. Litton
NOAH R. LITTON (0090479)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-2200
Noah.Litton@usdoj.gov

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Sentencing Memorandum was served this 9th day of October, 2018, electronically upon all counsel of record.

s/Noah R. Litton
NOAH R. LITTON (0090479)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-2200
Noah.Litton@usdoj.gov
